UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| MIDWEST MOTOR SPORTS, INC., a South Dakota corporation, d/b/a ELLIOTT POWER SPORTS;<br><br>Plaintiff,<br><br>vs.<br><br>ARCTIC CAT SALES, INC., a Minnesota Corporation,<br><br>Defendant. | C.V.. No. 99-4117<br><br>**PLAINTIFF'S BRIEF IN SUPPORT OF ITS MOTION FOR SANCTIONS** |

FILED
MAR 07 2000
CLERK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Plaintiff Midwest Motor Sports, Inc., a South Dakota corporation doing business as Elliott Power Sports, hereby respectfully submits this Brief in Support of Its Motion for Sanctions against Defendant and its counsel for hiring a private investigator to attempt to get Plaintiff to make admissions against its interest while the investigator wore a wire in order to secretly audiotape Plaintiff long after the commencement of litigation without the consent of its attorneys, and for doing the same thing to Jon Becker, a non-party witness known to be represented by counsel, in violation of Rules 4.2, 5.3 and 8.4 of the South Dakota Rules of Professional Conduct.

## INTRODUCTION

This is a sad and difficult brief to write. Plaintiff's counsel takes no pleasure in having to bring this motion. The Plaintiff recognizes and understands that Defendant's counsel has a duty to zealously represent its client. The Plaintiff respectfully suggests, however, that the conduct of the Defendant and its counsel in this case has spun out of control.

The heart of the matter is this: In November and December of 1999, long after the commencement of this action, Defendant and its counsel hired a private investigator to make secret audio recordings of Plaintiff and other witnesses in this case. The investigator was instructed by Defendant's counsel to pose as a customer while wearing a hidden electronic recording device and to try to get Plaintiff, whom it obviously knew to be represented by counsel, to make admissions against its interest for use as evidence in this case. The private investigator was instructed to do the same thing to Jon Becker, owner of A-Tech Cycle, a non-party witness in this case whom the Defendant also knew to be represented by its counsel, attorney Dan Lias.

Aside from shocking one's internal ethical and civil sensibilities as an officer of the court and member of the bar, this conduct is repugnant to the letter and spirit of the Rules of Professional Conduct:

> **Rule 4.2. Communications with Person Represented by Counsel.**
>
> In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

SDCL Ch. 16-18, Appendix, South Dakota Rules of Professional Conduct. The commentary to Rule 4.2 provides in part:

> In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. . . . This Rule also covers any person, whether or not a party to a formal proceeding, who is represented by counsel concerning the matter in question.

SDCL Ch. 16-18, Appendix, Rule 4.2 cmt.

2

Such conduct committed at the direction of an attorney by a nonlawyer agent, such as a private investigator, is equally repugnant to the Rules:

**Rule 5.3. Responsibilities Regarding Nonlawyer Assistants.**

With respect to a nonlawyer employed or retained by or associated with a lawyer:

(a) A partner in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer;

(b) A lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and

(c) <u>A lawyer shall be responsible for conduct of such a person that would be a violation of the rules of professional conduct if engaged in by a lawyer if:</u>

  (1) <u>the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved</u>; or

  (2) the lawyer is a partner in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

SDCL Ch. 16-18, Appendix, South Dakota Rules of Professional Conduct (emphasis supplied). The commentary to Rule 5.3 provides:

> Lawyers generally employ assistants in their practice, including secretaries, investigators, law student interns, and paraprofessionals. Such assistants, whether employees or independent contractors, act for the lawyer in rendition of the lawyer's professional services. A lawyer should give such assistants appropriate instruction and supervision concerning the ethical aspects of their employment, particularly regarding the obligation not to disclose information relating to the representation of the client, and should be responsible for their work product. The measures employed in supervising nonlawyers should take account of the fact that they do not have legal training and are not subject to professional discipline.

SDCL Ch. 16-18, Appendix, Rule 5.3 cmt. In addition, Rule 8.4(a) provides that it is misconduct

3

for a lawyer to "violate or attempt to violate the rules of professional conduct, knowingly assist or induce another to do so, or do so through the acts of another." SDCL Ch. 16-18 Appendix, Rule 8.4.

## BACKGROUND

This action was commenced in May of 1999. From the beginning, Plaintiff's counsel had instructed Defendant and its counsel not to attempt to contact its representatives without the permission of Plaintiff's counsel. *See* Plaintiff's Answers to Defendant's First Set of Interrogatories (**Exhibit A**) ("The Defendant is admonished not to attempt to contact representatives of the Plaintiff"). At first, these admonitions were the result of the Defendant's attempts to manufacture its defense that it had never really terminated or failed to renew the Plaintiff's snowmobile franchise by repeatedly contacting Plaintiff and pretending that it was still a dealer. *See* August 19, 1999 Letter of Steven M. Johnson to Tim R. Shattuck (**Exhibit B**). Defendant perpetrated this charade by sending self-serving letters (which appear to have been authored by Defendant's counsel) to Plaintiff and making unannounced visits to Plaintiff's store, whereupon Plaintiff's representatives would respectfully ask Mr. Glucky or whomever to leave and contact its counsel. This silly game continued long after Plaintiff instructed that all communications from Defendant be directed to Plaintiff's counsel. *See, e.g.,* October 11, 1999 Letter of Mark Simunds to Don Elliott (**Exhibit C**). As late as November 23, 1999, Defendant was instructed by its attorneys to enter Plaintiff's premises and pretend that Plaintiff was still a dealer. *See* Dan Glucky Memo (**Exhibit D**) ("Asked to leave / 1:39 PM by Joel per Don Elliott on Phone").

It has now come to light that in October of 1999, around the same time that the Defendant was issuing its deceptive subpoenas which violated the agreement of the parties regarding the Deposition of Jon Becker, President of A-Tech Cycle Service, a non-party witness represented by

4

attorney Daniel W. Lias, Defendant's counsel approached a private investigator named Adrian Mohr, a former special agent with the Federal Bureau of Investigation. *See* Deposition of Adrian Mohr (**Exhibit E**) at 4, 7-8. According to Mohr's invoices, he first met with Defendant's counsel for two hours on November 5, 1999. *See* Mohr Invoices (**Exhibit F**). Mohr's notes from that meeting are attached as **Exhibit G**. From the notes and Mohr's testimony, this discussion apparently began with Defendant's counsel suggesting to Mohr that Plaintiff's attorney Steve Johnson is unethical and stating that he violates ethical rules:

> Q: What does this say here?
>
> A: Breaking rules.
>
> Q: What is that?
>
> A: That's something that they discussed, said that you were breaking the rules.
>
> . . .
>
> Q: What did that have to do with your assignment, you being told that information?
>
> A: Nothing.

*Adrian Mohr* at 10-11. Over the next two hours, when they were not vilifying Plaintiff's counsel, Defendant's counsel apparently described for Mohr the undercover assignments that they had in mind for him. Essentially, Mohr's mission was to wear a wire, pose as a customer, and initiate conversations with the Plaintiff in accordance with an agenda or basic script created by Defendant's counsel in order to secretly tape record whatever admissions against Plaintiff's interest the investigator could elicit. *See Adrian Mohr* at 16. From the notes, its appears that the admissions sought to be secretly tape recorded by Defendant's counsel were to get Plaintiff to "Admit" that "Ski-

Doo and/or Yamaha" were "best", to "admit" that Plaintiff "could get an Arctic Cat" snowmobile, and to elicit admissions from Plaintiff regarding its loss of the Arctic Cat snowmobile franchise by having the investigator suggest that he "thought" Plaintiff "did" sell Arctic Cat snowmobiles. *See* Exhibit G (Mohr's notes from meeting with Defendant's counsel). In addition, Defendant's counsel instructed their private investigator to try to get Plaintiff to "Bad Mouth ATech Cycle" Service. *See* Exhibit G. Defendant's counsel instructed Mohr that one of the persons he might talk to was Plaintiff's sales manager, Jim LeTendre. *See* Exhibit G ("Sales MGR / Jim LeTendre (Leton)") (emphasis in original). Mohr was also supposed to elicit admissions regarding financing. *See* Exhibit G ("Financing: Get into it"). In addition, he was instructed to ask Plaintiff's sales manager, LeTendre, "If I buy Arctic Cat can I service it here" and "What about parts and accessories?" *See* Exhibit G; *Adrian Mohr* at 19.

> Q: . . . Would it be a fair statement that when you went into Elliott Power Sports that you did not tell anyone what your true mission was?
>
> A: That's correct?
>
> Q: Would it also be a fair statement that you did not tell anyone there that you were there at the request of [Defendant's counsel]?
>
> A: Correct.
>
> Q: Who was going to pay for your efforts, was it [Defendant's counsel], or was it Arctic Cat?
>
> A: I believe when I did this -- well, I billed [Defendant's counsel], and they in turn billed Arctic Cat for payment.

*Adrian Mohr* at 16-17.

In carrying out this covert operation, Defendant's counsel had Mohr travel to Interlakes Sports in Madison in order to get background information so that he could pose believably as a

6

snowmobile customer. *See Adrian Mohr* at 19-20; Exhibit G; Exhibit F. Interlakes is, in fact, a current Arctic Cat snowmobile franchisee. *See Adrian Mohr* at 20. There, Mohr pretended to be a customer and spoke with Steve Koch, Interlakes's owner. *See Adrian Mohr* at 19. Mohr did not secretly record this particular ruse. *See Adrian Mohr* at 20. The previous day, Mohr had done the same sort of reconnaissance at the Dakota Plains Polaris snowmobile dealership in Tea. *See Adrian Mohr* at 21-22; Exhibit F.

On November 11, 1999, Defendant's counsel had Mohr put on a wire and travel to A-Tech Cycle Service, Arctic Cat's own current snowmobile franchisee in Sioux Falls, to make a secret tape recording of its President and owner, Jon Becker. *See* Exhibit F; *Adrian Mohr* at 23. A copy of the tape recording of Jon Becker made from that visit is attached as **Exhibit H**. Mohr was wired in order to record anything that A-Tech might say "about the lawsuit." *Adrian Mohr* at 24. Mohr, Arctic Cat, and Arctic Cat's counsel knew that A-Tech was represented in this matter by its attorney, Dan Lias. *See Adrian Mohr* at 24. At this visit, Mohr was using his wife, Janine as "cover," to make them look more like people who might actually be interested in buying a snowmobile.

> Q: How were you treated at A-Tech?
>
> A: Very nicely. Jon Becker was, I guess is the owner, and he was the individual that helped us, did a nice job. He was very busy that day, it was a holiday, and he stuck with us and we learned a lot that day.

*Adrian Mohr* at 26.

On November 12, 1999, Mohr was instructed by Defendant's counsel to go out and make secret tape recordings of the Plaintiff at the Elliott Power Sports store. *See Exhibit F; Adrian Mohr* at 25. His wife was also along for this mission:

> Q: Why was she there?

7

> A: Companionship and cover.
>
> Q: You are using criminal terms now when you say cover. What do you mean, it makes you look more what, honest?
>
> A: Well, we are honest, and it made it look more credible.

*Adrian Mohr* at 27. A copy of this tape recording is attached as **Exhibit I**.

On November 15, 1999, Mohr met with Defendant's counsel for one hour to describe what he had recorded and to give them the tapes. *See* Exhibit F.

Ironically, at the same time that Defendant's counsel was impermissibly sending private investigators to elicit and secretly record conversations with Plaintiff at its store, Defendant's counsel was actually contacting Plaintiff's counsel to make an appropriate Rule 34 Request to inspect and videotape Plaintiff's store. *See* November 24, 1999 Letter (**Exhibit J**). Presumably, Defendant's counsel was also seeking permission from A-Tech Cycle's counsel to inspect and videotape its store, while at the same time paying a private investigator to make secret audio recordings of A-Tech Cycle's President and co-owner without seeking the permission of A-Tech's attorney. *See* December 20, 1999 Letter (**Exhibit K**).

On Christmas Eve, Mohr met again with Defendant's counsel to receive further instructions about making some more secret audio recordings of Plaintiff. *See* Exhibit F (December bill); *Adrian Mohr* at 27-28. At Defendant's counsel's direction, Mohr went to Plaintiff's store on December 27, 1999 and discovered that they were closed. *See* Exhibit F; *Adrian Mohr* at 28. On December 28, 1999, Mohr conducted some more "electronic monitoring" (as it is characterized in Mohr's bill to Defendant's counsel) of Plaintiff, this time using his daughter as "cover." *See* Exhibit F; *Adrian*

8

*Mohr* at 28. A copy of this tape recording is attached as **Exhibit L**.[1] Finally on January 6, 2000, Mohr met with Defendant's counsel at their law firm for one hour to give them the most recent audiotapes of Plaintiff. *See* Exhibit F; *Adrian Mohr* at 29-30.

> Q: Obviously the purpose of these trips wasn't to be a consumer shopping for a snowmobile, it was to attempt to elicit evidence in a pending civil case on behalf of the lawyers that hired you, correct?
>
> A: Yes, sir.

*Adrian Mohr* at 33.

> Q: In your years as an FBI agent, if someone was represented by an attorney, would you continue to talk to them and attempt to elicit evidence in a case?
>
> A: Criminal case?
>
> Q: Yes?
>
> A: If I knew they were represented, no.
>
> Q: In this particular case you knew there was a pending civil case, and you knew the people you were talking to were represented by counsel, did that concern you at all that you were recording people that were represented by counsel?
>
> A: No.
>
> Q: And why was that, sir?
>
> A: That's a good question. I guess because I am unfamiliar with civil procedures, that I assumed that it was one party monitoring.
>
> Q: What does one party monitoring mean?
>
> A: That I could monitor it myself, any conversation that I want to.
>
> Q: When you throw in the ingredient of somebody being represented by counsel that throws a curve ball at you, doesn't it?

---

[1] The Deposition of Janine Mohr, which lasted approximately three minutes, is attached as **Exhibit M.**

9

A: Yes.

Q: Did you have any discussion with [Defendant's counsel] on that subject?

A: I believe I asked them if what I am going to be doing is legal.

Q: What did they tell you?

A: Yes.

Q: That was before you went out and did these things?

A: Yes.

Q: Did [Defendant's counsel] visit with you about any rules of professional conduct with regard to communications with a person represented by counsel?

A: No.

*Adrian Mohr* at 34-35.

## ARGUMENT

A federal district court has the inherent authority and responsibility to regulate and supervise the bar practicing before it. *See Greiner v. City of Champlin*, 152 F.3d 787, 790 (8th Cir. 1998); *Jenkins v. Missouri*, 931 F.2d 470, 484 (8th Cir. 1991); *Fred Weber, Inc. v. Shell Oil Co.*, 566 F.2d 602, 605 (8th Cir. 1977). The court has wide discretion in framing sanctions to remedy abuses, including attorney disqualification, assessment of attorney fees, monetary sanctions, and the dismissal of an action. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991).

Neither the Rules of Civil Procedure, the Rules of Professional Conduct, nor the informal rules of civility and professional courtesy typically enforced in South Dakota contemplate that an attorney in a pending civil litigation will have to be worried that the opposing counsel is sending one of its hired agents to wear a wire and initiate conversations with his client under false pretenses in

an attempt to elicit admissions against its interest and other evidence for use in the case. To the contrary, it is generally acknowledged that when one attorney would like to elicit statements about the case from the opposing party, he will contact that party's attorney to arrange for a deposition. The practice of law in South Dakota should not be permitted to degenerate into the sorry spectacle of attorneys or their agents making secret tape recordings of the opposing party's conversations (or placing electronic bugs to monitor conversations - the next logical step) in order to manufacture some sort of "evidence." Covert "electronic monitoring" or eavesdropping on opposing parties by attorneys as officers of the court has no place in the civil administration of justice. The legal process *is not a spy game.* As the South Dakota Supreme Court has made clear, "[t]he duty of an attorney to his client demands nothing more than an honest effort to secure justice for such client; it does not permit, neither does it excuse, a resort to deception to procure for a client even that to which the attorney honestly believes his client entitled." *In re Wilmarth*, 172 N.W. 921, 925 (S.D. 1919).

The Plaintiff respectfully suggests that Defendant's counsel lost track of its professional compass when it blatantly violated Rule 4.2 , 5.3, and 8.4 of the South Dakota Rules of Professional Conduct by paying a former FBI agent to initiate conversations with Plaintiff without the consent of its counsel and to make secret audiotape recordings while attempting to elicit evidence in the form of admissions against interest from Plaintiff, and that it violated those rules yet again when it hired the same agent to initiate and secretly record conversations with Jon Becker of A-Tech Cycle Service, a non-party witness known to be represented by counsel.

Rule 4.2 is clear that when a party is represented by counsel, the opposing attorney may not communicate with that party about the subject matter of the representation without the consent of its attorney. The commentary to Rule 4.2 makes it clear that it applies with equal force to non-party

11

witnesses, (such as A-Tech Cycle and its President, Jon Becker), who are represented by counsel for the litigation at issue. Defendant's counsel was well aware that the Plaintiff is represented by its counsel in this matter, and that A-Tech Cycle is represented by attorney Dan Lias in this litigation.

Rule 5.3 provides that an attorney is responsible for any conduct of a private investigator it hires which would be a violation of the Rules if done by the attorney "if the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved." It is undisputed that the improper conduct in this case occurred at the express instruction of Defendant's counsel, which hired the former FBI agent explicitly to conduct the "electronic monitoring" in this case.

One can imagine the indignation and protests that would come from Defendant if Plaintiff had the audacity and brazen disregard for the Rules to secretly wire up an agent to enter Arctic Cat's headquarters and attempt to record Arctic Cat making statements against its interest. And yet that is precisely what Defendant has done. Indeed, the conduct at issue—not simply attempting to make *ex parte* contacts with parties represented by counsel, but actually employing trickery and deception to attempt to elicit statements and admissions against interest under false pretenses by secretly tape recording manufactured conversations with parties and witnesses known to be represented by counsel—is so blatantly violative of any standard of professional conduct, that the Rules and ethical treatises do not seem to even contemplate such surreptitious antics. This is not a grey area. Indeed, the United States Court of Appeals for the Eighth Circuit has recently affirmed the issuance of sanctions for conduct violative of Rules 4.2 and 5.3 which was much less egregious than that which has occurred in this case, but similar in that it involved an attorney retaining a third party to employ trickery and deceit in order to obtain statements from a party represented by counsel. *See Greiner v. City of Champlin*, 152 F.3d 787, 790 (8th Cir. 1998). In *Greiner*, the Eighth Circuit held that the

district court did not abuse its discretion in awarding sanctions against an attorney who failed to stop his expert witness from causing a third party to contact and question a civil defendant represented by counsel. *See id.* The court held that because the conduct would have violated the ethical rules *if the attorney had initiated it himself, the attorney had prior knowledge of the expert's intent, the* expert falsely represented himself to be acting on the instruction of the court, and the attorney exploited this improper contact by seeking to depose the third party, Rules 4.2 and 5.3 were violated and sanctions were appropriate. *See id.*; *see also People v. Crews*, 901 P.2d 472, 475 (Colo. 1995) (en banc) (attorney's submission, in response to investigation of attorney, of tape recording of telephone conversation between himself and former spouse that he secretly recorded without her knowledge or consent, while he knew she was represented by counsel, constitutes forbidden communication on subject of representation of client with party attorney knows to be represented by counsel without prior consent of counsel and constitutes conduct involving dishonesty, fraud, deceit, or misrepresentation).

Indeed, the ABA Committee in Ethics and Professional Responsibility has long taken the position that, with the exception of prosecutors, it is unethical for an attorney to tape record a conversation without the prior knowledge or consent of all the parties to the conversation. *See* ABA Committee on Ethics and Professional Responsibility, Formal Opinion 337 (1974). As the Colorado Supreme Court has explained: "Inherent in the undisclosed use of a recording device is an element of deception, artifice, and trickery which does not comport with the high standards of candor and fairness by which all attorneys are bound." *People v. Selby*, 606 P.2d 45, 47 (Colo. 1979). Rule 5.3 imputes the act of making secret tape recordings of conversations initiated under false pretenses with Plaintiff and A-Tech Cycle to Defendant and its counsel since those improper acts occurred at their

13

direction and at their financial expense.

## CONCLUSION

The Plaintiff respectfully suggests that the conduct at issue in this case is such that a clear message must be sent that it will not be tolerated in parties to civil actions or among the members of this bar. A civil litigation over the wrongful termination of a snowmobile franchise should not be permitted to devolve into a forum for the adulterated practices of wiretaps, bugs, and other trickery of that ilk. The pattern evinced in this case of deceptive subpoenas, short-trigger subpoenas issued without notice to counsel, witnesses who perceive themselves to have been intimated and harassed, and vilification and maligning of Plaintiff's counsel to outside parties also counsel favorably toward the judicious imposition of sanctions against Defendant and its counsel in this case.

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court grant its Motion for Sanctions in this case as follows:

(1) Striking Defendant's Amended Answer and entering judgment for Plaintiff on the issue of liability; and

(2) Imposing a substantial monetary sanction, including an award of all attorney fees and expenses incurred by the Plaintiff to date.

Dated this 7th day of March, 2000.

JOHNSON, HEIDEPRIEM, MINER,
MARLOW & JANKLOW, L.L.P.

BY _[signature] for_
Steven M. Johnson
431 N. Phillips Ave. Suite 400
Sioux Falls, SD 57104
(605) 338-4304

*Attorneys for the Plaintiff*

14

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the **Plaintiff's Brief in Support of Its Motion for Sanctions** was on this day sent by U.S. mail, postage prepaid, to attorneys for the Defendant, Roger W. Damgaard and Tim R. Shattuck, Woods, Fuller, Shultz & Smith, P.C., 300 South Phillips Avenue, Suite 300, P.O. Box 5027, Sioux Falls, SD 57117-5027. Dated this 7th day of March, 2000.

_RAParsons for_
Steven M. Johnson