UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| MIDWEST MOTOR SPORTS, INC., | \* | CIV. #99-4117 |
| Plaintiff, | \* | |
| vs. | \* | **PLAINTIFF'S ANSWERS TO** |
| | \* | **DEFENDANT'S INTERROGATORIES** |
| ARCTIC CAT SALES, INC., | \* | **(FIRST SET)** |
| Defendant. | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

COMES NOW Don Elliott, President of Midwest Motor Sports, Inc., being first duly sworn upon his oath, and makes the following Answers to Defendant's Interrogatories (First Set):

1. State the name, address, telephone number and occupation of each person who has knowledge of any facts or information relating to the matters at issue and for each person identified state in detail the facts known by the individual.

**ANSWER: Objection. This interrogatory is objected to to the extent that it seeks information which is protected by the work product doctrine. Without waiving that objection, individuals with knowledge may include:**

**ELLIOTT POWER SPORTS:**
*(The Defendant is admonished not to attempt to contact representatives of the Plaintiff.)*

> **Don R. Elliott**
> **Elliott Power Sports**
> **5000 S. Louise Ave**
> **Sioux Falls, SD 57108**
> **(605) 361-7433**
> **Owner/President/Sales Director**



ATTORNEYS AT LAW

# Johnson, Heidepriem, Miner, Marlow & Janklow, L.L.P.

Falls Center
431 North Phillips Avenue, Suite 400
Sioux Falls, South Dakota 57104-5933
Telephone (605)338-4304 • FAX (605)338-4162

**Reply To: Sioux Falls**

August 19, 1999

Steven M. Johnson
Scott N. Heidepriem
Celia Miner
Michael F. Marlow
A. Russell Janklow
Chad W. Swenson
Sheila S. Woodward
Ronald A. Parsons, Jr.

Mark F. Marshall, P.C.
*Of Counsel*

P.O. Box 667
200 West Third Street
Yankton, SD 57078-0667
Telephone (605)665-5009
FAX (605)665-4788

Tim R. Shattuck
Woods, Fuller, Shultz & Smith, P.C.
PO Box 5027
Sioux Falls, SD 57117-5027

**By Facsimile: 339-3357**

Re:    Midwest Motor Sports, Inc. v. Arctic Cat Sales, Inc.

Dear Tim:

I am attaching <u>another</u> letter your client sent to mine. Our clients have lawyers. I assume you informed your client not to communicate with mine during this litigation. This letter appears to be one written either by his lawyers, or someone on his behalf, in order to mitigate damages and argue his position. You and your client both know that Elliott Sports was terminated and no amount of letter writing is going to change that. Your client informed mine on more than one occasion that this area would not support more than one franchise dealer and yet it set up a dealer in direct violation of the South Dakota statute. Why would they do that? Obviously, they had decided to terminate Elliott. Would you please have your client stop writing letters and playing this silly game. A jury will see through this in a minute.

Very truly yours,

STEVEN M. JOHNSON
For the firm

SMJ:dkm
cc:   Mr. Don Elliott by facsimile
      Mr. Ronald A. Parsons, Jr.

EXHIBIT
B



**ARCTIC CAT**®

October 11, 1999

Mr. Don Elliott
Elliott Power Sports
5000 South Louise Avenue
Sioux Falls, SD 57108

Dear Don:

As you know, Elliott Power Sports signed a Dealer Agreement with Arctic Cat on March 4, 1999. You mailed this Agreement to Arctic Cat, and Arctic Cat signed it on May 12, 1999, before you sued Arctic Cat for allegedly terminating your dealer relationship with it. The Dealer Agreement signed by both you and Arctic Cat is effective from April 1, 1999, to March 31, 2000. As you are aware, pursuant to the terms of the Dealer Agreement, the Agreement can only be terminated in writing. As you have admitted under oath, neither Arctic Cat nor Elliott Power Sports has terminated the Agreement in writing. In short, Elliott Power Sports has always had and continues to have a valid Dealer Agreement with Arctic Cat.

Under the Dealer Agreement, Elliott Power Sports is entitled to all of the rights possessed by any other dealer. Again, we invite Elliott Power Sports to order year 2000 snowmobiles, parts, and accessories. As we have previously informed you on numerous occasions, Arctic Cat will do everything possible to promptly and timely fulfill any orders from Elliott Power Sports.

Very truly yours,

Mark Simunds
Western Regional Sales Manager



EXHIBIT

C

ARCTIC CAT SALES INC., P.O. BOX 810, 601 BROOKS AVE. S., THIEF RIVER FALLS, MN 56701 TELEPHONE (218) 681-8558 FAX (218) 681-3162



**Reload for Snow**
**Merchandising Checklist**
(To be completed by Dealer and Arctic Cat DSM)

| Yes | No | |
|-----|-----|---|
| X | — | Is exterior neat and clean? |
| — | X | Is there an Arctic Cat presence with signage both exterior and interior? |
| X | — | Are the hours of operation posted on front door? |
| X | — | Is the sales floor clean and free of clutter? |
| — | X | Is there a fair representation of Arctic Cat snowmobiles on display? |
| N/A | | Is there a fair representation of Arctic Cat ATV's on display? |
| N/A | | If dealer is a generator Master Dealer is the generator rack on the sales floor and stocked? |
| — | X | Are all Arctic Cat snowmobiles, ATV's, and generators clearly priced? |

Are the following PG&A key categories easily recognized, signed, priced, and merchandised correctly?

| Yes | No | |
|-----|-----|---|
| — | X | **Arcticwear** - Riding gear. |
| — | X | - Sportswear. |
| — | X | - Gifts & collectibles. |
| — | X | **Parts & Accessories** - Machine accessories. |
| — | X | - Traction control. |
| — | X | - oil care. |

Is all possible Arctic Cat PG&A product displayed on the sales floor? (Only duplicate stock in backroom).

Is there an accessorized snowmobile and ATV on the sales floor?

Do you have the 2000 Arcticwear and Accessories CATalogs available to your customers?

Are you utilizing all the merchandising program items that were sent? (Fixtures, signage, etc.).

Does the sales floor reflect a Holiday theme?

**Identify the top three merchandising actions to be completed.**

1. _____

2. _Asked to Leave / 1:50 PM By_ _Joel per Dan Elliot on phone._

3. _____

Dlr # _578827_  Dlr Name _Elliot Powersports_  Signature _____

DSM _Dan Clucky_        Date _11-23-99_

**EXHIBIT**

**D**



Page 1

```
 1              UNITED STATES DISTRICT COURT
 2                DISTRICT OF SOUTH DAKOTA
 3                   CENTRAL DIVISION
   * * * * * * * * * * * * * * * * * * *
 4
   MIDWEST MOTOR SPORTS, INC.,
 5 a South Dakota Corporation,
   D/b/a Elliott Power Sports,
 6
                        Plaintiff,
 7
            -vs-              CIV. NO. 99-4117
 8
   ARCTIC CAT SALES, INC.,
 9 a Minnesota Corporation,
10                      Defendant.
11 * * * * * * * * * * * * * * * * * * *
12              D E P O S I T I O N    O F
13                   ADRIAN MOHR
14 * * * * * * * * * * * * * * * * * * *
15 APPEARANCES:
16     Johnson, Heidepriem, Miner, Marlow & Janklow
           Attorneys at Law
17         431 North Phillips Avenue
           Sioux Falls, South Dakota  57104
18     By  Mr. Steven Johnson
               for the Plaintiff;
19
       Woods, Fuller, Shultz & Smith
20         Attorneys at Law
           300 South Phillips Avenue
21         Sioux Falls, South Dakota  57104
       By  Mr. Roger Damgaard and Mr. Timothy Shattuck
22             for the Defendant;
23
24
25
```

Page 2

```
 1              INDEX TO EXAMINATIONS
   EXAMINATION BY MR. JOHNSON ................. 3
 2
 3
 4
 5
 6
 7
 8              INDEX TO EXHIBITS
   1 Mr. Mohr's Bill for Services ...... 8
 9
   2 Mr. Mohr's Bill for Services ..... 27
10
   3 Mr. Mohr's Handwritten Notes ...... 9
11
   4-5 Mr. Damgaard's Letters to
12 Mr. Paul Ihle ......................... 31
13 6 A-Tech Audio Tape ................. 22
14 7 Elliott Sports Audio Tape ........ 26
15 8 Elliott Sports Audio Tape ........ 28
16 9-13 Brochures ..................... 32
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              S T I P U L A T I O N
 2        It is stipulated and agreed by and
 3 between the above-named parties, through their attorneys
 4 of record, whose appearances have been hereinabove
 5 noted, that the deposition of Adrian Mohr, may be taken
 6 at this time and place, that is, at the offices of
 7 Woods, Fuller, Shultz & Smith, Sioux Falls, South
 8 Dakota, on the 25th day of February, 2000, commencing at
 9 the hour of 9:00 a.m.; said deposition taken before
10 JERRY MAY, a Registered Professional Reporter and Notary
11 Public within and for the State of South Dakota; said
12 deposition taken for the purpose of discovery or for use
13 at trial or for each of said purposes, and said
14 deposition is taken in accordance with the applicable
15 Rules of Civil Procedure as if taken pursuant to written
16 notice.
17
18        ADRIAN MOHR,
19 called as a witness, being first duly sworn, deposed and
20 said as follows:
21
22 EXAMINATION BY MR. JOHNSON:
23    Q.  Would you tell us your name?
24    A.  Adrian Mohr, M-O-H-R.
25    Q.  Where do you live, sir?
```

Page 4

```
 1    A.  Sioux Falls, South Dakota.
 2    Q.  Your occupation is what?
 3    A.  I am a private investigator.
 4    Q.  Prior to that what was your occupation?
 5    A.  Special agent with the Federal Bureau of
 6 Investigation.
 7    Q.  How long were you involved in that position?
 8    A.  From 1969 to 1999, nearly thirty years.
 9    Q.  You retired, did you?
10    A.  Yes.
11    Q.  So your private detective business started in
12 1999?
13    A.  Yes.
14    Q.  About what time?
15    A.  I retired April 2nd, and I started right
16 after that.
17    Q.  Your educational background, could you tell
18 me about that?
19    A.  I have a BS from the University of Northern
20 Colorado, attended the University of Colorado, and no
21 postgraduate other than work related.
22    Q.  Work related?
23    A.  Work related in-services, and some of those
24 hours counted with the University
25    Q.  I assume you have testified
```

EXHIBIT
E

Page 5

1   A. Yes.
2   Q. By deposition and in court, or am I wrong
3 about that?
4   A. Grand jury, depositions, this is probably my
5 first deposition.
6   Q. They don't take a lot of those in the
7 criminal area, do they?
8   A. No.
9   Q. But is it fair to say you have testified many
10 times in court?
11   A. Yes.
12   Q. In your service with the FBI did you ever
13 take any legal training, in-service?
14   A. Yes.
15   Q. Education, that type of thing?
16   A. Yes.
17   Q. Would that cover -- well, tell me what that
18 would cover?
19   A. It would cover areas of search and seizure,
20 some criminal procedure, court, court procedures, and
21 asset forfeiture, those various kinds of things that
22 would come up in criminal court.
23   Q. Would it cover things like attorney/client
24 privilege, that type of thing?
25   A. Yes, sir.

Page 6

1   Q. Then your business here in Sioux Falls, what
2 is that called?
3   A. Adrian Mohr Investigations and Consulting.
4   Q. What is the nature of that business?
5   A. I am open to investigations, both civil type
6 of investigations, and possibly some defense work. I
7 will not work on divorces.
8   Q. You won't spy on cheating spouses?
9   A. No, and I haven't had an offer, or I have had
10 an offer for workmen's comp cases and I don't want to
11 work those either.
12   Q. What is the nature of the work you have done
13 since April of 1999?
14   A. Basically I have had some fraud investigation
15 working with Community First State Bank in Vermillion.
16 Bartron Clinic, a large embezzlement up there, and some
17 various other cases. I have done a couple of defense
18 work cases, one at Standing Rock that did not involve
19 the FBI, and one at Milbank for the Ray Rylance, a
20 defense attorney on a rape of a four year old girl.
21   Q. Have you done any work for the law firm of
22 Woods, Fuller, Shultz & Smith?
23   A. Yes.
24   Q. What work have you done for them?
25   A. Besides this I have done the Community First

Page 7

1 State Bank, Bartron Clinic embezzlement, I have done a
2 couple of other checks on individuals for the firm.
3   Q. So you have done three or four projects
4 besides the Arctic Cat case?
5   A. Yes.
6   Q. Would those all be for the same lawyers at
7 Woods, Fuller that you are working for in the Arctic Cat
8 case?
9   A. No.
10   Q. You live here in Sioux Falls?
11   A. Yes.
12   Q. Do you have a cabin at Lake Madison?
13   A. In-law's cabin. We are a third owner now
14 with my wife's siblings.
15   Q. Of a cabin at Lake Madison?
16   A. Yes.
17   Q. Can you tell me how it came to be that you
18 got involved in the Elliott Sports versus Arctic Cat
19 case?
20   A. Yes. Roger and Tim requested that I go out
21 and do some shopping in regards to the snowmobile
22 business.
23   Q. Did that start with a phone call to you?
24   A. I think I was here actually on another
25 matter, probably the Bartron Clinic, which broke heavily

Page 8

1 in October of 1999, and I think I was here on that
2 matter.
3   Q. You have produced your file pursuant to a
4 subpoena that I served upon you?
5   A. Yes.
6   Q. I am going to mark some of the things in your
7 file, we can make copies if you want to keep copies of
8 them.
9
10        (Mohr Deposition Exhibits 1-8 marked For
11        identification.)
12
13   Q. Mr. Mohr, we have marked some things from
14 your file. You have got some bills and expense
15 documents in your file, would that reflect all of the
16 bills that you sent to this law firm and/or Arctic Cat
17 with regard to your assignment in this case?
18   A. Yes.
19   Q. Exhibit No. 1, it looks like it is a bill of,
20 for the month of November, 1999, would that be correct?
21   A. Yes.
22   Q. Would that reflect everything that you did
23 concerning your assignment during the month of November?
24   A. Yes.
25   Q. What does that indicate in terms of when you

Page 9

1 first met with Mr. Damgaard and Mr. Shattuck?
2    A. November 5, 1999, 10:00 a.m.
3    Q. Where did that meeting take place?
4    A. In Mr. Shattuck's office.
5    Q. Can you tell me, maybe there is other
6 documents that would help refresh your memory, what the
7 nature of that discussion was? I am looking at what we
8 have marked as Exhibit 3, which is four pages of what I
9 understand to be your notes, one of them happens to be
10 dated November 5, would it help you to look at that?
11    A. If you are going to ask me direct questions
12 off of it I will.
13    Q. I want to know generally what was the nature
14 of the meeting on November 5, and you can use Exhibit 3
15 or Exhibit 1?
16    A. This was the meeting notes that I took while
17 discussing what the attorneys wanted me to do, and
18 getting a background of snowmobiles as much as they
19 knew, because I knew nothing about them other than I had
20 ridden one a couple of times. This was a general
21 background of things they wanted me to look at.
22    Q. Did you understand your assignment to include
23 ultimately recordings such as we have sitting in front
24 of us?
25    A. Yes, sir.

Page 10

1    Q. Can I just go through this with you. On
2 Exhibit 3, which is your notes, correct?
3    A. Yes.
4    Q. Dated 11-5, I see my name there and it says
5 versus, what does that jog your memory concerning me?
6    A. Versus Woods, Fuller.
7    Q. What does this say here?
8    A. Breaking rules.
9    Q. What is that?
10    A. That's something that they discussed, said
11 that you were breaking the rules.
12    Q. What rules was I breaking?
13    A. I don't know for sure.
14    Q. You have no recollection of that?
15    A. There was some sort of conflict between
16 attorneys, there were four or five attorneys mentioned,
17 and some of them are named here.
18    Q. Where?
19    A. Dan Lias, L-I-A-S.
20    Q. On page 2?
21    A. Yes, and I think there was Chad Swenson, a
22 partner of Johnson's.
23    Q. Can you give me your best recollection about
24 what it is that you were told concerning any breaking of
25 rules by Johnson and Swenson or anybody else?

Page 11

1    A. Something to the effect that you might have
2 represented both dealers, snowmobile dealers on this
3 matter, both A-Tech and Don Elliott Sports.
4    Q. What did that have to do with your
5 assignment, you being told that information?
6    A. Nothing.
7    Q. Do you know why they shared their thoughts on
8 that subject with you?
9    A. No. Had there been further discussion I
10 probably would have had more notes. I mean they were
11 talking between themselves as well as to me.
12    Q. Was the insinuation that Steve Johnson and/or
13 other members of his law firm were somehow violating
14 ethical rules, those that lawyers are bound to follow?
15    A. That conversation didn't take place, it was a
16 matter of some sort of conflict, and I am not sure.
17    Q. Did you understand that it was a conflict
18 that somehow broke rules as your notes indicate?
19    A. Possibly, yes.
20    Q. Did you think better or worse of us after you
21 heard that?
22    A. I didn't think worse of you, no.
23    Q. My recollection is I think you came in our
24 office and dropped some cards off, I have them sitting
25 here.

Page 12

1    A. I did not come to the office.
2    Q. Did these come in the mail?
3    A. Yes, they did, with a letter to Scott
4 Heidepriem.
5    Q. You know Scott?
6    A. Yes, I do.
7    Q. So you sent him some of your cards?
8    A. Yes, sir, along with a letter that you have,
9 that's the only advertisement that I have ever done.
10    Q. In any event, other than members of my law
11 firm breaking various rules, was there any other
12 discussion about the lawyers involved in the
13 Elliott-Arctic Cat matter?
14    A. No. As far as the work they were doing, I
15 think as the notes reflect there was a lawsuit,
16 Department of Revenue hearing, it didn't mean anything
17 to me about whatever they do in the Department of
18 Revenue hearings. I don't know anything about that, or
19 what that is about.
20    Q. On page 2, the top, it says only a witness
21 slash win-win and then quotes around Jon Becker, tell us
22 about that, what did they tell you concerning Jon
23 Becker?
24    A. That he was the owner of A-Tech, and age 40.
25 I had a concern that maybe I knew him because there is a

Page 13

1 Jon Becker that was a hockey player here that my son
2 played against and his father was a coach, Joe Becker.
3 Only a witness, that would have been in regards to Don
4 Elliott.
5    Q.  What does it say under oath with Steve
6 Johnson, what is that about?
7    A.  Must have been that you took a deposition
8 from him, I don't recall.
9    Q.  Subpoena documents dash Steve Johnson shows
10 up, what is that supposed to tell us?
11    A.  That Woods, Fuller subpoenaed some documents,
12 I think sales records if I can recall, and that you
13 showed up for A-Tech.
14    Q.  What's the relevance of that concerning your
15 involvement?
16    A.  Only that -- concerning my involvement,
17 nothing.
18    Q.  Was there some innuendo that there was
19 something wrong about that?
20    A.  Evidently Don Lias was supposed to show up
21 with the records, or was representing A-Tech, and you
22 showed up when the subpoena was issued.
23    Q.  And there was some insinuation there was
24 something wrong about that, is that what you are
25 suggesting that they said?

Page 14

1    A.  Well, that they said, could be a conflict
2 because you are representing Don Elliott Sports also.
3    Q.  Then it says 3 slash 31 slash 99 terminated.
4 Terminated, what is that supposed to tell us?
5    A.  Evidently there was a deposition scheduled, I
6 don't know who was there, and it was canceled.
7    Q.  What does that have to do with anything?
8    A.  I was just taking notes.  There were a lot of
9 things being discussed, and I probably missed some
10 notes.
11    Q.  Missed some of it I suppose.  Then can you
12 run through the rest of this for me, just generally go
13 through it and tell me what it is you recall them
14 telling you?
15    A.  They requested that I visit the show room at
16 Don Elliott's, and to see what was there.
17    Q.  Just a visual?
18    A.  Yes.
19    Q.  Or were you going to talk to people?
20    A.  Both.  I was going to talk to a salesman and
21 see what the salesman represented in the way of the
22 product that they were promoting, what kind of equipment
23 they had, that sort of stuff.
24    Q.  I assume that you had some discussion with
25 Mr. Damgaard and Mr. Shattuck about the way that you

Page 15

1 were able to wire yourself and record these
2 conversations?
3    A.  I told them I was able to do that, yes.
4    Q.  Why was that necessary, to record the
5 conversations of people at Elliott Power Sports?
6    A.  To memorialize the conversations that I had
7 with the sales people, and so there were no mistakes.
8    Q.  Did you, I assume you did based on our prior
9 conversations today, that you knew that Elliott Power
10 Sports was represented by counsel?
11    A.  Yes.
12    Q.  You knew there was a pending lawsuit, did you
13 not?
14    A.  Yes.
15    Q.  Tell me what else is set forth on page 2 of
16 your notes?
17    A.  They wanted me to go out to the dealership
18 and find out which snowmobiles they were recommending
19 and why, look at the equipment that was there.
20    Q.  Did they tell you why you should do that?
21    A.  I think that they wanted to determine what
22 was selling best, whether they were hurt because Arctic
23 Cat wasn't being sold there any longer.
24    Q.  And you were supposed to determine that on a
25 site visit?

Page 16

1    A.  If I could.
2    Q.  I have listened to your tapes.  Did
3 Mr. Damgaard and Mr. Shattuck tell you what to ask?
4    A.  They did not give me a script, they indicated
5 from my notes various things here, thought you sold
6 Arctic Cat, and which are the best snowmobiles.
7    Q.  These things that have like quotes around
8 them?
9    A.  Yes.
10    Q.  In other words, these are things that they
11 wanted you to say to the sales people to see what the
12 sales people would say back to you and you would record
13 that?
14    A.  Yes, sir, and as you heard the tapes, you
15 heard a lot of information provided to me about
16 individual snowmobiles and the product that they were
17 selling.
18    Q.  Were you treated courteously by the sales
19 people at Elliott Sports?
20    A.  Very courteous, a young man named Bill, very
21 nice young man.
22    Q.  It may be obvious, but would it be a fair
23 statement that when you went in to Arctic Cat -- strike
24 that.
25        Would it be a fair statement that when

Page 17

1  you went in to Elliott Power Sports that you did not
2  tell anyone there what your true mission was?
3      A.  That's correct.
4      Q.  Would it also be a fair statement that you
5  did not tell anyone there that you were wired to record
6  the conversation?
7      A.  That's correct.
8      Q.  Would it be also a fair statement that you
9  did not tell anyone there that you were there at the
10  request of Mr. Shattuck and Mr. Damgaard?
11     A.  Correct.
12     Q.  Who was going to pay you for your efforts,
13  was it the Woods, Fuller law firm, or was it Arctic Cat?
14     A.  I believe when I did this -- well, I billed
15  Woods, Fuller, and they in turn billed Arctic Cat for
16  payment.
17     Q.  I notice on Exhibit No. 1 there is a check
18  stub that looks like Arctic Cat paid your bill?
19     A.  Yes, sir.
20     Q.  And --
21     A.  There should be a cover letter for this one
22  too, a copy of my -- here it is.
23     Q.  So you sent your bill to Mr. Damgaard and
24  Mr. Shattuck, your understanding is they sent that to
25  Arctic Cat, and you got a check from Arctic Cat?

Page 18

1      A.  Yes, sir.
2      Q.  And then I notice at the bottom of page 2 of
3  Exhibit 3 you have asterisks around bad-mouth A-Tech,
4  were you trying to see whether Elliott would bad-mouth
5  A-Tech?
6      A.  Yes.
7      Q.  They didn't, did they?
8      A.  No.
9      Q.  Page 3 of Exhibit 3, are we still on your
10  first visit with Mr. Damgaard and Mr. Shattuck here at
11  the Woods, Fuller law firm?
12     A.  Yes.
13     Q.  I notice that there is the words financing,
14  and then you wrote get into it, that's something you
15  were supposed to get into?
16     A.  See what type of promotions were offered,
17  what type of interest rates.
18     Q.  Something about close-outs, what is that
19  about?
20     A.  I believe that see if they had any close-out
21  prices, because the snowmobile season was, November it
22  should have been nearly over, or the sales.  See if they
23  had close-out prices of the '99's.
24     Q.  Then down here it says what Elliott salesman
25  telling customer.  What is that about?

Page 19

1      A.  That was to have the sales person relate to
2  me, you know, the situation on all the snowmobiles, and
3  why he doesn't have Arctic Cat any more and that type of
4  stuff, if I could get that out of him.
5      Q.  Then the name Jim LeTendre is written in
6  there, were you supposed to try to talk to him?
7      A.  No.  They indicated that he was the sales
8  manager, I may or may not see him when I was there.
9      Q.  Then you were supposed to ask him if you
10  bought Arctic Cat could you get it serviced elsewhere?
11     A.  Yes, or there.
12     Q.  Or there?
13     A.  Yes.
14     Q.  Farther down there is a box around Interlakes
15  with the name of Steve B., what is that last name?
16     A.  Cook.
17     Q.  What is that about?
18     A.  That is K-O-C-H as I learned later.  They
19  indicated I should go to, since I didn't know anything
20  about the snowmobile business, go to Interlakes and see
21  Steve Koch and get some background on snowmobiles, which
22  I did.
23     Q.  Did you record that conversation?
24     A.  No, I did not.
25     Q.  Did Mr. Koch know what your mission was?

Page 20

1      A.  No, other than to a potential customer for
2  the purchase of snowmobiles.
3      Q.  So you went up to Interlakes Sports, which is
4  an Arctic Cat franchise in Madison?
5      A.  I believe he has all four snowmobiles, yes.
6      Q.  But he's also an Arctic Cat franchisee?
7      A.  Yes, sir.
8      Q.  And got information out of him to help you
9  ask questions when you came back to Sioux Falls and
10  recorded these meetings at Elliott Power Sports and
11  A-Tech, correct?
12     A.  Yes, sir.
13     Q.  Page 4, is that a part of your meeting with
14  Damgaard and Shattuck?
15     A.  No, page 4 is notes that I took while I was
16  talking to the salesman Bill at Elliott Sports.
17     Q.  I assume these notes would reflect things
18  that were said to you that we would find on tape if we
19  listened to it?
20     A.  Yes.  Basically the quotes, the pricing, some
21  of the promotional information in regards to percent for
22  financing, and what kind of clothing might go along with
23  it, and some other things that Bill, questions I write
24  down like DPM, which are some features on the various
25  snowmobiles that were extra or made them a little

Page 21

1 better.
2    Q. Were these notes made by you when you were in
3 the show room?
4    A. Yes.
5    Q. Or was this made later?
6    A. I am sorry, yes, in the show room.
7    Q. You actually carried a notebook in with you?
8    A. Yes.
9    Q. Is it a fair statement that page 4 of Exhibit
10 3 are the only notes that you took while you were there?
11    A. I don't believe so, I might have had some
12 quotes that I copied and stapled into the front of these
13 brochures.  For instance, the Ski Doo they gave me a
14 suggested retail price list, and I wrote Cortrust there,
15 that's who financed it.
16    Q. I am going to go through these later?
17    A. I just wanted to show you where the quotes
18 were.  Here is what they gave me at Interlakes.
19    Q. So let's see, according to Exhibit 1 you met
20 with Arctic Cat's lawyers here on November 5.  On
21 November 8 it looks like you went to Dakota Plains
22 Polaris dealership in Tea?
23    A. Yes.
24    Q. Was that just to find out more about
25 snowmobiles?

Page 22

1    A. That was my initial dealership visit.
2    Q. You didn't record anything there, did you?
3    A. No, sir.
4    Q. On November 9th you went to Interlakes, and
5 you have told us about that visit?
6    A. Yes, sir.
7    Q. Did you ask them anything about Elliott Power
8 Sports when you were up there?
9    A. I don't believe so.
10    Q. Then November 11, according to Exhibit 1, you
11 wrote in your bill investigation at A-Tech Cycle
12 Service, one hour?
13    A. Yes, sir.
14    Q. I show you what's been marked as Exhibit 6
15 which is an audio tape provided to us.  Would that be
16 the audio tape for your visit to A-Tech on November 11?
17    A. Yes, sir.
18    Q. I see you have got, the one you put in your
19 hidden jacket, or whatever it is, is smaller, but that
20 was re-duplicated as Exhibit 6?
21    A. I didn't re-duplicate that, I assume Woods,
22 Fuller probably did, yes, sir.
23    Q. Can you explain to me, because I am not,
24 never got in to criminal law much, so wires and things
25 like that are not something I am that familiar with.

Page 23

1    Can you tell us how that works, I mean what do you have
2 to have on and how do you set that up?
3    A. I had on a basic light jacket, had an inside
4 pocket, the recording device was in the pocket of my
5 jacket, and I had the microphone clipped on the inside
6 of that pocket on the inside of the jacket so it could
7 pick up the conversation through my jacket.
8    Q. So even though the microphone is hidden, it
9 still picks up the voices around you?
10    A. Fairly well, yes.
11    Q. Nothing is visible to who you might be
12 talking with, I assume?
13    A. No.
14    Q. Is this something that you learned at the
15 FBI?
16    A. Yes.
17    Q. I mean I assume you have done this before?
18    A. Yes.
19    Q. As a part of criminal investigation?
20    A. Some, yes.
21    Q. I think we covered up to November 11.  Who
22 told you to go out to A-Tech Cycle Service then,
23 Mr. Damgaard and Mr. Shattuck?
24    A. Yes, sir.
25    Q. What were you supposed to do out there?

Page 24

1    A. Become familiar with the Arctic Cat line of
2 snowmobiles.
3    Q. Now you did record that conversation out
4 there, though?
5    A. Yes.
6    Q. Do you have an understanding of why you were
7 recording at A-Tech?
8    A. I assumed that if the sales person there
9 would say anything about the lawsuit, other than
10 memorializing the information on the product that they
11 were selling, too.
12    Q. Well, did it confound you at all that A-Tech
13 was an existing Arctic Cat franchisee and you were
14 recording there on behalf of Arctic Cat and its lawyers?
15    A. I am sorry, did it confound me?
16    Q. Yes, confuse you?
17    A. No.
18    Q. Based on Exhibit 3, you knew that Arctic, or
19 that A-Tech was represented by counsel, Mr. Lias?
20    A. Yes.
21    Q. How were you treated at A-Tech?
22    A. Very nicely.  Jon Becker was, I guess is the
23 owner, and he was the individual that helped us, did a
24 nice job.  He was very busy that day, it was a holiday,
25 and he stuck with us and we learned a lot that

Page 25

1 particular day.
2    Q. Was he promoting Arctic Cat products?
3    A. Oh, yes.
4    Q. They don't have any others to promote in
5 terms of snowmobiles, do they?
6    A. No. Maybe used ones, I wasn't interested in
7 used.
8    Q. Did Mr. Becker say anything negative about
9 Elliott Power Sports or any other competitor of his?
10    A. No.
11    Q. What about the lawsuit, did he say anything
12 about the lawsuit?
13    A. I don't believe so.
14    Q. Then according to Exhibit 1 which is your
15 bill on November 12, 1999 it says investigate the
16 Elliott Sports Center Technical follow-up, what does
17 that mean?
18    A. Review of the tape.
19    Q. So you went out there, recorded?
20    A. Yes, sir.
21    Q. Your conversation, then you went back and
22 listened to it, right?
23    A. Yes, sir.
24    Q. Why did you do that for Elliott and you
25 didn't do it for the A-Tech tape, according to your bill

Page 26

1 anyway?
2    A. I didn't, I probably listened to them at the
3 same time, or reviewed them a little bit to make sure
4 there was something on the tape. If there wasn't, I
5 would have to go back.
6    Q. Then on November 15th according to this bill
7 marked Exhibit 1 you met with Mr. Damgaard and
8 Mr. Shattuck for an hour, where did that meeting take
9 place?
10    A. Either in Mr. Damgaard's office or
11 Mr. Shattuck's. I think Mr. Damgaard's, because I
12 brought in the tape and the brochures and things like
13 that.
14    Q. Did you listen to the tapes with those
15 lawyers?
16    A. No.
17    Q. But you presented the tapes to them?
18    A. Yes, sir.
19    Q. Did you make notes of that meeting?
20    A. No.
21    Q. Then looking at Exhibit 2 -- before I do
22 that, I show you Exhibit 7, which is an audio tape
23 marked Elliott 11-12-99. Would that be the recording of
24 the salesman and yourself and others at Elliott Power
25 Sports on November 12, 1999?

Page 27

1    A. Yes, sir.
2    Q. By the way, my understanding is your wife was
3 along on this venture?
4    A. The visit to A-Tech and Elliott she was
5 along, yes, sir.
6    Q. Why was she there?
7    A. Companionship and cover.
8    Q. You are using criminal terms now when you say
9 cover. What do you mean, it makes you look more what,
10 honest?
11    A. Well, we are honest, and it made it look more
12 credible.
13    Q. Was there some thought that either people at
14 A-Tech or at Elliott might perceive that you are an
15 investigator and you were out to find out information
16 about this lawsuit?
17    A. No, I don't think so.
18    Q. Looking at Exhibit 2, that is a bill which
19 looks to be for the month of December and first part of
20 January concerning your work for Mr. Damgaard and
21 Mr. Shattuck?
22    A. Yes.
23    Q. Let's go through that if we can. December
24 24th, Christmas Eve day, I presume, you met with
25 Attorneys Damgaard and Shattuck here in this office for

Page 28

1 an hour?
2    A. Yes.
3    Q. What was that meeting about?
4    A. I was here on another matter with
5 Mr. Damgaard, and we also discussed I was going to go
6 back to Elliott Sports and see if they had got another
7 shipment of snowmobiles in, or what the status was at
8 that time.
9    Q. Were you supposed to record anyone in
10 particular at Elliott Power Sports?
11    A. No. I did ask for Bill when I went back, and
12 if he was there, fine, and he was, and if he wasn't, I
13 was going to take another sales person.
14    Q. Then December 27, 1999 it says attempt to
15 conduct electronic monitoring, tell me about that?
16    A. It is the holiday season, I prepared myself,
17 and my daughter and I went out there. They were closed
18 because of the holidays, giving their employees an extra
19 day off.
20    Q. Your daughter went with you as cover that
21 time instead of your wife?
22    A. Yes.
23    Q. And on December 28, 1999 it says electronic
24 monitoring at Elliott Sports. Would that be reflected
25 in Exhibit 8, the audio tape I am showing you?

Page 29

1  A. Yes.
2  Q. Do you have any notes about what you were
3 supposed to attempt to elicit from Elliott Power Sport's
4 employees for that particular recording session?
5  A. No.
6  Q. Can you tell me what it is you were supposed
7 to find out?
8  A. It was just more of the same information,
9 going out there, seeing what they had on the show room
10 floor in the way of Arctic Cat, Ski Doo and Yamaha, and
11 so we did that.
12  Q. You could do that without recording your
13 conversation with employees of Elliott. Why were you
14 supposed to record your conversation with Elliott
15 employees on this second visit?
16  A. Well, we were continuing to develop
17 information about their product, and how they have been
18 doing as far as the sales of the particular snowmobiles.
19  Q. And you did so?
20  A. Yes, sir.
21  Q. How were you treated on that visit?
22  A. Fine.
23  Q. Appeared to be a well run dealership?
24  A. Yes.
25  Q. Then in Exhibit 2 on January 6, the year

Page 30

1 2000, it says you consulted with Attorney Damgaard and
2 provided him the tapes, is that correct?
3  A. The tape, yes.
4  Q. It says tapes, but it was really one tape?
5  A. Yes, sir.
6  Q. Did you make any notes of that meeting with
7 Mr. Damgaard?
8  A. No.
9  Q. Was that the end of your involvement in this
10 particular case, or is there more?
11  A. That was the end of it that particular time.
12  Q. Have you done anything since January 6 of the
13 year 2000 in terms of your work for Attorneys Damgaard
14 and/or Shattuck with regard to Elliott Power Sports?
15  A. Just the preparation for this deposition.
16  Q. What did that consist of?
17  A. Reviewing -- excuse me, the attorneys had
18 never seen my personal file at home, and I brought that
19 in and went through the personal notes with them.
20  Q. Those are the things that you just shared
21 with me?
22  A. Yes, sir.
23  Q. Is there anything that was in your file that
24 you removed before you gave it to me today?
25  A. Today, no. Possibly some, when I re-did the

Page 31

1 quotes like I showed you in here, I had to have those on
2 another piece of paper, and I destroyed those after I
3 transcribed them on to this, on to these quotes that are
4 inside the brochures.
5  Q. But other than that, have you removed
6 anything out of your file before your deposition here
7 today?
8  A. No.
9  Q. Are there any other tape recordings that you
10 made other than these?
11  A. No, sir.
12  Q. I am just going to show you Exhibits 4 and 5.
13 Are those the letters that Mr. Damgaard sent to Arctic
14 Cat to have them pay for your services?
15  A. Yes.
16  Q. You got copies of those when they were sent
17 out, correct?
18  A. Yes, these are the copies that I received
19 from Mr. Damgaard.
20  Q. You notice on those letters they are sent to
21 a Mr. Paul Ihle, an attorney in Thief River Falls, did
22 you ever have any discussions with Mr. Ihle?
23  A. No.
24  Q. Have you talked to anyone else about your
25 assignment as you have described it to us this morning

Page 32

1 besides Mr. Damgaard, Mr. Shattuck, your wife and
2 daughter?
3  A. No.
4  Q. Did you consult with anyone about how you
5 should go about this engagement besides these attorneys?
6  A. No.
7
8    (Mohr Deposition Exhibits 9-13 marked For
9    identification.)
10
11  Q. Mr. Mohr, we have marked Exhibits 9, 10, 11,
12 12 and 13. Would these be various promotional materials
13 you received on your visit to the dealerships you
14 described in your previous testimony?
15  A. Yes.
16  Q. In the brochures there is attached either
17 handwritten notes or typewritten price lists of various
18 snowmobiles that you procured at those respective
19 dealerships?
20  A. Yes.
21  Q. Was that something you were asked to do as
22 well, or did you do that on your own?
23  A. I did that on my own.
24  Q. Did you buy a snowmobile from any of these
25 dealerships?

Page 33

1    A.  No.
2    Q.  Your intent was not to buy a snowmobile, was
3  it?
4    A.  Potentially.  Having retired and having
5  grandchildren, we thought it might be nice to have one
6  up at Lake Madison, but on these particular trips I was
7  not intending on buying a snowmobile.
8    Q.  Obviously the purpose of these trips wasn't
9  to be a consumer shopping for a snowmobile, it was to
10 attempt to elicit evidence in a pending civil case on
11 behalf of the lawyers that hired you, correct?
12   A.  Yes, sir.
13   Q.  Did your wife and daughter ever meet with
14 Mr. Damgaard or Mr. Shattuck?
15   A.  No.
16   Q.  I notice in the visit to Elliott Sports when
17 your wife was there she asked some probing questions
18 that lawyers might want to ask at a deposition.  Did you
19 sort of program her how to do that?
20   A.  I briefed her a little bit in regards to when
21 we go in here, you know, we know nothing about
22 snowmobiles, we want to learn about the snowmobiles, and
23 have them tell us why we should buy a particular
24 product.
25   Q.  Had she ever been involved with you before in

Page 34

1  any under cover work like this?
2    A.  I may have used her on a surveillance, we go
3  in a restaurant or something surveilling an individual,
4  maybe on one occasion in 29 plus years.
5    Q.  Since you have your own consulting and
6  investigation service I was wondering whether you had
7  ever used her before?
8    A.  No.
9    Q.  In your years as an FBI agent, if someone was
10 represented by an attorney, would you continue to talk
11 to them and attempt to elicit evidence in a case?
12   A.  Criminal case?
13   Q.  Yes?
14   A.  If I knew they were represented, no.
15   Q.  In this particular case you knew there was a
16 pending civil case, and you knew the people you were
17 talking to were represented by counsel, did that concern
18 you at all that you were recording people that were
19 represented by counsel?
20   A.  No.
21   Q.  And why was that, sir?
22   A.  That's a good question.  I guess because I am
23 unfamiliar with civil procedures, that I assumed that it
24 was one party monitoring.
25   Q.  What does one party monitoring mean?

Page 35

1    A.  That I could monitor it myself, any
2  conversation that I want to.
3    Q.  When you throw in the ingredient of somebody
4  being represented by counsel that throws a curve ball at
5  you, doesn't it?
6    A.  Yes.
7    Q.  Did you have any discussions with
8  Mr. Damgaard or Mr. Shattuck on that subject?
9    A.  I believe I asked them if what I am going to
10 be doing is legal.
11   Q.  What did they tell you?
12   A.  Yes.
13   Q.  That was before you went out and did these
14 things?
15   A.  Yes.
16   Q.  Did Mr. Damgaard or Shattuck visit with you
17 about any rules of professional conduct with regard to
18 communications with a person represented by counsel?
19   A.  No.
20        MR. JOHNSON: I have no other questions.
21        MR. DAMGAARD:  We will read and sign.
22
23
24
25

Page 36

1        Pursuant to SDCL 15-6-30 (e), (Rule 30 of
2  the Federal Rules of Civil Procedure,) I have read the
3  forgoing pages 1-35 inclusive, and have noted any and
4  all corrections of error found in the transcript that I
5  believe the Court Reporter has made in the taking and
6  transcribing of my testimony, and have signed below.
7
8
9
10
11
12   _____
         ADRIAN MOHR
13
14
15
16    Subscribed and sworn to before me this
17 _____ day of _____, 2000.
18
19
20
21
22   _____
        NOTARY PUBLIC
23
24
25

2/25/00
EXHIBIT
Mohr #1
Jerry J. May

## RECAPITULATION OF EXPENSES

## NOVEMBER 1999

| | | | |
|---|---|---|---|
| Investigation/consultation/transcription | 8 hrs. | @$50 | $400.00 |
| Travel status | 2 hrs. | @$25 | $ 50.00 |
| Mileage | 108 | @.31/mi | $ 33.48 |
| SD Sales Tax | | | $ 29.02 |

**Total Due**                                                                    **$512.50**

Adrian Mohr
Adrian Mohr Investigations and Consulting
5112 South Pennbrook Avenue
Sioux Falls, SD 57108
Tax Identification #523546904
SD Sales Tax #51-001-000119370T-ST-001



EXHIBIT
F

# STATEMENT OF EXPENSES

**Arctic Cat**                                                   **File # 99-011**
**Elliott Sports Center**

**Nov. 5, 1999**
10:00 a.m.      Initial Consultation with Attorneys
                Roger W. Damgaard and Tim Shattuck/
                Arctic Cat Law Suit                              2 hours        $100.00

**Nov. 8, 1999**
                Visit Dakota Plains (Polaris Dealership)
                Tea, SD                                          1 hour         $ 50.00

**Nov. 9, 1999**
                Visit Interlakes Sports
                Madison, SD
Mileage         108                                             $.31/mile      $ 33.48
Travel          @$25/hr.                                        2 hours        $ 50.00
Investigative time                                              1 hour         $ 50.00

**Nov. 11, 1999**
                Investigation at A-Tech Cycle Service            1 hour         $ 50.00

**Nov. 12, 1999**
                Investigation at Elliott Sports Center
                Technical Follow-up                              2 hours        $100.00

**Nov. 15, 1999**
                Met with Roger Damgaard and Tim Shattuck
                (RE: Investigation)                              1 hour         $ 50.00

2/25/00
**EXHIBIT**
Mohr # 2
Jerry J. May

January 18, 2000

Roger W. Damgaard
Tim R. Shattuck
Attorneys-at-Law
Woods, Fuller, Shultz & Smith P.C.
PO Box 5027
Sioux Falls, SD 57117-5027

Re:    **Arctic Cat**
       **Elliott's Sports Center**
       **File #99-011**

Dear Roger and Tim:

Enclosed is my statement of expenses concerning the captioned investigation.

I look forward to our continued working relationship in 2000.  Thank you.

Sincerely,

Adrian Mohr
Encl:   Statement of Expenses
        File #99-011

PAID IN FULL
2/9/00

SENT
1/19/00

## STATEMENT OF EXPENSES

**Arctic Cat**
**Elliott Sports Center**

File # 99-011

**Dec. 24, 1999**
    Consultation with Attys. Damgaard and
    Shattuck                          1 hour     $ 50.00

**Dec. 27, 1999**
    Attempt to conduct electronic monitoring    ½ hour    $ 25.00

**Dec. 28, 1999**
    Electric monitoring @ Elliott Sports    1 hour    $ 50.00

**Jan. 6, 2000**
    Consult with Atty. Damgaard/ provide tapes    1 hour    $ 50.00

## RECAPITULATION OF EXPENSES
### December 1999 – January 2000

Investigation/consultation/transcription    3 1/2 hrs.    @$50    $175.00

SD Sales Tax    $ 10.50

**Total Due**    **$185.50**

Adrian Mohr
Adrian Mohr Investigations and Consulting
5112 South Pennbrook Avenue
Sioux Falls, SD 57108
Tax Identification #523546904
SD Sales Tax #51-001-000119370T-ST-001

DETACH AND RETAIN FOR YOUR RECORDS

**ARCTIC CAT INC.**
P.O. BOX 810
THIEF RIVER FALLS, MN 56701

| VENDOR NO. | VENDOR NAME |
|---|---|
| 000317 | MORJAN BODR |

| TRANSACTION DATE | REFERENCE | P.O. NUMBER | GROSS AMOUNT | DEDUCTION | NET AMOUNT |
|---|---|---|---|---|---|
| 11/05/99 | 99 011 | | 91,512.50 | 0.00 | 91,512.50 |

| CHECK DATE | CHECK NO. | | TOTAL GROSS | TOTAL DEDUCTION | CHECK AMOUNT |
|---|---|---|---|---|---|
| 12/13/99 | 242909 | | 91,512.50 | 0.00 | 91,512.50 |

**ARCTIC CAT INC.**
P.O. BOX 810
THIEF RIVER FALLS, MN 56701

DETACH AND RETAIN FOR YOUR RECORDS

| TRANSACTION DATE | REFERENCE | P.O. NUMBER | GROSS AMOUNT | DEDUCTION | NET AMOUNT |
|---|---|---|---|---|---|

VENDOR NO. [illegible]   VENDOR NAME [illegible]

| CHECK DATE | CHECK NO. | TOTAL GROSS | TOTAL DEDUCTION | CHECK AMOUNT |
|---|---|---|---|---|

MERLE A. JOHNSON
RICHARD O. GREGERSON
JOHN E. SIMKO
WILLIAM G. TAYLOR
WILLIAM P. FULLER
STUART L. TIEDE
GARY P. THIMSEN
BRADLEY C. GROSSENBURG
JAMES M. WIEDERRICH
COMET H. HARALDSON
J. G. SHULTZ
ROGER W. DAMGAARD
FREDERICK M. ENTWISTLE
DAVID C. KROON
MARK J. WELTER

**WOODS, FULLER, SHULTZ & SMITH P.C.**

LAWYERS

300 SOUTH PHILLIPS AVENUE, SUITE 300

POST OFFICE BOX 5027

SIOUX FALLS, SOUTH DAKOTA  57117-5027

TELEPHONE (605) 336-3890
TELECOPIER (605) 339-3357

E-MAIL: rdamgaar@wfss.com

January 25, 2000

JAMES E. MOORE
KRISTINE L. KREITER
ELIZABETH A. LEWIS
TIMOTHY R. SHATTUCK
JAYNA M. VOSS
MELANIE L. CARPENTER
SUSAN M. SABERS
WILLIAM G. BECK
MARLON M. LOFGREN

FRANCIS M. SMITH - OF COUNSEL

MELVIN T. WOODS (1899-1983)
HOWELL L. FULLER (1909-1981)
JOHN B. SHULTZ (1912-1975)



Mr. Paul Ihle
Ihle & Sparby, P.A.
312 North Main Avenue
P.O. Box 574
Thief River Falls, MN 56701



Re:   Midwest Motor Sports, Inc. vs. Arctic Cat Sales, Inc.
CIV. 99-4117

Dear Paul:



Please find enclosed Adrian Mohr's statement for services in the amount of $185.50 for the above matter.   I would appreciate it if you have this statement paid directly to Mr. Mohr.

Thank you.



Sincerely,

WOODS, FULLER, SHULTZ & SMITH P.C.



Roger W. Damgaard

Enclosure
cc:    Mr. Mark Simunds
bcc:   Mr. Adrian Mohr

**WOODS, FULLER, SHULTZ & SMITH P.C.**

LAWYERS

300 SOUTH PHILLIPS AVENUE, SUITE 300

POST OFFICE BOX 5027

SIOUX FALLS, SOUTH DAKOTA  57117-5027

TELEPHONE (605) 336-3890
TELECOPIER (605) 339-3357

E-MAIL: rdamgaar@wfss.com

MERLE A. JOHNSON
RICHARD O. GREGERSON
JOHN E. SIMKO
WILLIAM G. TAYLOR
WILLIAM P. FULLER
STUART L. TIEDE
GARY P. THIMSEN
BRADLEY C. GROSSENBURG
JAMES M. WIEDERRICH
COMET H. HARALDSON
J. G. SHULTZ
ROGER W. DAMGAARD
FREDERICK M. ENTWISTLE
DAVID C. KROON
MARK J. WELTER

JAMES E. MOORE
KRISTINE L. KREITER
ELIZABETH A. LEWIS
TIMOTHY R. SHATTUCK
JAYNA M. VOSS
MELANIE L. CARPENTER
SUSAN M. SABERS
WILLIAM G. BECK
MARLON M. LOFGREN

FRANCIS M. SMITH · OF COUNSEL

MELVIN T. WOODS (1899-1983)
HOWELL L. FULLER (1909-1981)
JOHN B. SHULTZ (1912-1975)

December 1, 1999



2/25/00
EXHIBIT
Mohn # 5
Jerry J. May

Mr. Paul Ihle
Ihle & Sparby, P.A.
312 North Main Avenue
P.O. Box 574
Thief River Falls, MN 56701

Re:   Midwest Motor Sports, Inc. vs. Arctic Cat Sales, Inc.
      CIV. 99-4117

Dear Paul:

Please find enclosed a copy of our investigator, Adrian Mohr's statement of expenses indicating a total due of $512.50 in the above matter.  I would appreciate it if Arctic Cat would pay the statement directly to Mr. Mohr at the address indicated.

Thank you for your cooperation.  Do not hesitate to contact me if you have any questions or concerns.

Sincerely,

WOODS, FULLER, SHULTZ & SMITH P.C.

Roger W. Damgaard

Enclosure
bcc:   Mr. Adrian Mohr

DON'T SUPER STORE
11/5   ELLIOT SPORTS   FORMER POLICE
(TIM SHATTUCK)

* ARTIC CAT / THIEF RIVER FALLS

STEVE JOHNSON US.   BREAKING RULES

2/25/00
EXHIBIT
Mohr #3
Jerry J. May

SHOWROOM / SERVICE   CLOTHING / PARTS

* PACKED FULL OF STUFF / MARKET

— ALLEDGING 3/31/99 — "DROPPED" / SEPARATE CONTRACTS FULL LINE

— TAKING BEST PRODUCTS AND CONTINUING TO SELL

3/31/ 1998 — NO MORE WATERCRAFT & ATV
VOLUNTARILY DROP —
— LIKE SNOWMOBILES — (REPLACE W SKIDOO)

"ATECH" — 12TH  NEGOTIATING
12/98 LAW SUIT
ELLIOT / RECORDING TELES W ARTIC
NO
2000 MODEL YEAR CONTRACT   3/99 FILES A LAW SUIT

EXHIBIT
tabbies
G

A / TECH ( SNOWMOBILE FRANCHISE) CHRIS SIMONSON
PAXTON / JOHNSON
DEPT OF REV. — HEARING

② 

ONLY A WITNESS / WIN-WIN

"JON BECKER" — ATECH (AGE 40)

CONFLICT (DAN LIAS) SCHEDULE MTG (CANCELLED)

→ UNDER OATH W/ STEVE JOHNSON

SUBPOENA DOCUMENTS — STEVE JOHNSON SHOWS UP

DEPOSITION CONTINUED / 14" TO QUASH (PERSELL)
                        DOCUMENTS

DEPOSITION —

3/31/99 TERMINATED

— OWNERER PRINTS & SOLD UNIT —

SHOW: SHOWROOM FULL OF ARTIC CAT (80%)
        PRODUCT AND OTHERS

                                    NO GAP

*SELLING NONE OF SKIDOO / YAMAHA / POLARIS

   2 SNOWMOBILES

SALESMAN    SUITS           DON'T KNOW NOT
            HELMETS         BEST KIND OF
            TRAILER         DIFFERENCES → RECOMMEND
                                          WHY

                *SPORTY / TOURING*

SLED
CLOTHES  — "ADMIT SKIDOO & OR YAMAHA BEST—
            BUT WOULD GET AN ARTIC CAT
            "THOUGHT DID" SELL

* COMPETITOR    * BADMOUTH ATECH *
                HOW LONG — POLARIS

③

FINANCING : ( GET INTO IT )

"CLOSE - OUTS"

$26,000 PROFIT
( O - 4% ) $7000
( MAKE $350 )
* MARK UP ON ACCESSORIES

POLARIS 40%
SKIDOO / ARCTIC CAT
YAMAHA

SALES MGR / JIM LETENDRE
( LEON )

WHAT ELLIOTT SALESMAN TELLING CUSTOMER
WANTS
NEEDS          SKIDOO      "THEY ARE BEST"
INVENTORY      YAMAHA

* IF I BUY ARCTIC CAT CAN I SERVICE IT
HERE —    "INTERLAKES"
WHAT ABOUT PARTS & ACCESSORIES

* COMBINATION PACKAGE *

INTERLAKES
STEVE B. CROIX
MADISON
RED HAIR

ELLIOTT / BILL

YAMAHA   VENTURE ⌐    3 YR
VALVE HOST / METAL W/ PLASTIC SKIN

FRIEND NOW / NO PYMT
NO INT

SKIDOO   (BY FM)   ROTAX / BMW
              BEST        CAMDOIN — 1 YR

DPM — HIGH ALT TUNE / DURABLE HWD
                                      MOST

DIGITM / PWR / MGT  "TECH"

DESS > SECURITY                    5 SERVICE TECHS

GABE / DELUXE                    [ LIQUID COOLED ]

11/15   $400  PYMT / CASH OFFER   [ NO PYMT 0 ]
        $200  FAN COOLED            [ JAN 0 ]

                                    4.9%  > 60 DAYS
                                            NO PYM

YAMAHA —                           CONTINUES

WOODS, FULLER, SHULTZ & SMITH P.C.

LAWYERS

300 SOUTH PHILLIPS AVENUE, SUITE 300

POST OFFICE BOX 5027

SIOUX FALLS, SOUTH DAKOTA  57117-5027

TELEPHONE (605) 336-3890
TELECOPIER (605) 339-3357

E-MAIL: tshattuc@wfss.com

MERLE A. JOHNSON
RICHARD O. GREGERSON
JOHN E. SIMKO
WILLIAM G. TAYLOR
WILLIAM P. FULLER
STUART L. TIEDE
GARY P. THIMSEN
BRADLEY C. GROSSENBURG
JAMES M. WIEDERRICH
COMET H. HARALDSON
J. G. SHULTZ
ROGER W. DAMGAARD
FREDERICK M. ENTWISTLE
DAVID C. KROON
MARK J. WELTER

JAMES E. MOORE
KRISTINE L. KREITER
ELIZABETH A. LEWIS
TIMOTHY R. SHATTUCK
JAYNA M. VOSS
MELANIE L. CARPENTER
SUSAN M. SABERS
WILLIAM G. BECK
MARLON M. LOFGREN

FRANCIS M. SMITH · OF COUNSEL

MELVIN T. WOODS (1899-1983)
HOWELL L. FULLER (1909-1981)
JOHN B. SHULTZ (1912-1975)

November 24, 1999

Mr. Steve Johnson
Johnson, Heidepriem, Miner,
    Marlow & Janklow, L.L.P.
431 North Phillips Avenue, Suite 400
Sioux Falls, SD 57104-5933

Re:   Midwest Motor Sports, Inc. v. Arctic Cat Sales, Inc.

Dear Steve:

Enclosed please find a Rule 34 Request for Inspection.  As you will note from the Request, Arctic Cat wishes to inspect, photograph, and videotape plaintiff's store.  As also indicated in the Request, Arctic Cat is willing to work with the plaintiff in scheduling the inspection.  At your earliest convenience, please contact me so that we can discuss scheduling the inspection.

Very truly yours,

WOODS, FULLER, SHULTZ & SMITH P.C.

Tim R. Shattuck

Enclosure



EXHIBIT
J

WOODS, FULLER, SHULTZ & SMITH P.C.

LAWYERS

300 SOUTH PHILLIPS AVENUE, SUITE 300

POST OFFICE BOX 5027

SIOUX FALLS, SOUTH DAKOTA 57117-5027

TELEPHONE (605) 336-3890
TELECOPIER (605) 339-3357

MERLE A. JOHNSON
RICHARD O. GREGERSON
JOHN E. SIMKO
WILLIAM G. TAYLOR
WILLIAM P. FULLER
STUART L. TIEDE
GARY P. THIMSEN
BRADLEY C. GROSSENBURG
JAMES M. WIEDERRICH
COMET H. HARALDSON
J. G. SHULTZ
ROGER W. DAMGAARD
FREDERICK M. ENTWISTLE
DAVID C. KROON
MARK J. WELTER

JAMES E. MOORE
KRISTINE L. KREITER
ELIZABETH A. LEWIS
TIMOTHY R. SHATTUCK
JAYNA M. VOSS
MELANIE L. CARPENTER
SUSAN M. SABERS
WILLIAM G. BECK
MARLON M. LOFGREN

FRANCIS M. SMITH - OF COUNSEL

MELVIN T. WOODS (1899-1983)
HOWELL L. FULLER (1909-1961)
JOHN B. SHULTZ (1912-1975)

February 21, 2000

Mr. Steven M. Johnson
Mr. Ronald A. Parsons, Jr.
Johnson, Heidepriem, Miner,
       Marlow & Janklow, L.L.P.
431 North Phillips Avenue, Suite 400
Sioux Falls, SD 57104-5933

Re:    Midwest Motor Sports v. Arctic Cat

Gentlemen:

Enclosed is an audio tape of Adrian Mohr's visit to A-Tech Cycle Service on November
11, 1999.  This is in partial compliance with the Subpoena served on him.  The other
documents will be produced at the time of his deposition.

                    Very truly yours,

                    WOODS, FULLER, SHULTZ & SMITH P.C.

                    Tim R. Shattuck

Enclosure

ATTORNEYS AT LAW

# Johnson, Heidepriem, Miner,
# Marlow & Janklow, L.L.P.

Falls Center
431 North Phillips Avenue, Suite 400
Sioux Falls, South Dakota 57104-5933
Telephone (605)338-4304 • FAX (605)338-4162

**Reply To: Sioux Falls**

December 20, 1999

Steven M. Johnson
Scott N. Heidepriem*
Celia Miner
Michael F. Marlow
A. Russell Janklow
Chad W. Swenson
Sheila S. Woodward
Ronald A. Parsons, Jr.
Matthew T. Tobin
Steven K. Huff**

*Also Admitted in Minnesota
**Admitted Only in Iowa

Mark F. Marshall, P.C.
*Of Counsel*

P.O. Box 667
200 West Third Street
Yankton, SD 57078-0667
Telephone (605)665-5009
FAX (605)665-4788

Timothy R. Shattuck
Woods, Fuller, Shultz & Smith, P.C.
PO Box 5027
Sioux Falls, SD 57117-5027

*Faxed  12/20/99*

Re:    Midwest Motor Sports, Inc. v. Arctic Cat Sales, Inc.

Dear Tim:

It has come to our attention that you may have served an additional subpoena or other request to A-Tech Cycle to videotape its premises. If that is so, please provide us with a copy of the subpoena or request and inform us of the time and date. We would like to be present for any such visit. I imagine that A-Tech's attorney, Mr. Lias, would also like to be present.

Very truly yours,

STEVEN M. JOHNSON
For the firm

SMJ:dkm
cc:    Mr. and Mrs. Elliott
       Mr. Dan Lias



**EXHIBIT**

K



Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

* * * * * * * * * * * * * * * * * *

MIDWEST MOTOR SPORTS, INC.,
a South Dakota Corporation,
D/b/a Elliott Power Sports,

                    Plaintiff,

    -vs-                    CIV. NO. 99-4117

ARCTIC CAT SALES, INC.,
a Minnesota Corporation,

                    Defendant.

* * * * * * * * * * * * * * * * * *

D E P O S I T I O N   O F

JANINE MOHR

* * * * * * * * * * * * * * * * * *

APPEARANCES:

    Johnson, Heidepriem, Miner, Marlow & Janklow
    Attorneys at Law
    431 North Phillips Avenue
    Sioux Falls, South Dakota  57104
    By  Mr. Steven Johnson
        for the Plaintiff;

    Woods, Fuller, Shultz & Smith
    Attorneys at Law
    300 South Phillips Avenue
    Sioux Falls, South Dakota  57104
    By  Mr. Roger Damgaard and Mr. Timothy Shattuck
        for the Defendant;

Page 2

INDEX TO EXAMINATIONS
EXAMINATION BY MR. JOHNSON .................. 3

INDEX TO EXHIBITS

(Disposition of Exhibits Discussion)

Page 3

S T I P U L A T I O N

It is stipulated and agreed by and between the above-named parties, through their attorneys of record, whose appearances have been hereinabove noted, that the deposition of Janine Mohr, may be taken at this time and place, that is, at the offices of Woods, Fuller, Shultz & Smith, Sioux Falls, South Dakota, on the 25th day of February, 2000, commencing at the hour of 9:50 a.m.; said deposition taken before JERRY MAY, a Registered Professional Reporter and Notary Public within and for the State of South Dakota; said deposition taken for the purpose of discovery or for use at trial or for each of said purposes, and said deposition is taken in accordance with the applicable Rules of Civil Procedure as if taken pursuant to written notice.

JANINE MOHR,

called as a witness, being first duly sworn, deposed and said as follows:

EXAMINATION BY MR. JOHNSON:

Q. Tell us your name, please?

A. Janine Mohr.

Q. You are married to Adrian Mohr?

Page 4

A. Yes.

Q. Your husband's deposition was just taken, you were not in the room with us, is that correct?

A. That's correct.

Q. Have you ever had your deposition taken before?

A. No, I have not.

Q. You probably wonder when lawyers talk about depositions what that all means, we will at least give you a little preview of what that is about.  Did you do anything to prepare for your deposition this morning?

A. No, other than just visited this morning with Roger to find out what it was.

Q. And had you known Roger for some time?

A. I met him for the first time this morning.

Q. Tell me, Ma'am, were you involved at all in any meetings with anyone prior to you and your husband going out to Elliott Power Sports or A-Tech?

A. No, I was not.

Q. Had you ever been involved in any other sort of under cover activities of Adrian Mohr Investigations prior to that time?

A. No, I had not.

Q. What was your understand[ing] and your husband were supposed

EXHIBIT

M

Page 5

1  Elliott Power Sports?
2      A.  To find out about snowmobiles.
3      Q.  I noticed you asked some questions of some of
4  the sales people that were talking to you at Elliott
5  Power Sports in particular, do you recall those
6  conversations?
7      A.  Very little.
8      Q.  But you did ask questions of some of the
9  sales people, did you not?
10     A.  Yes, I did.
11     Q.  How did you come up with the nature of those
12 questions, they seemed to be good, probing questions
13 to me when I listened to them?
14     A.  I think I have a natural curiosity.
15     Q.  Did you know what you and your husband were
16 supposed to ferret out from anyone at Elliott when you
17 went there?
18     A.  It was mostly my understanding that we were
19 to find out about snowmobiles, and if they were
20 available, and what types were good snowmobiles, if we
21 were looking, what we would want to purchase.
22     Q.  I noticed you and/or your husband asked
23 questions about Arctic Cat, and why Arctic Cat wasn't
24 there any longer.  How did you come up with those
25 questions?

Page 6

1      A.  I was aware that they were probably not
2  selling them any more.
3      Q.  You knew there was a pending lawsuit, and you
4  knew that your husband was hired by lawyers for Arctic
5  Cat, and that your mission was to go out there and
6  record conversations with those employees, did you not,
7  Ma'am?
8      A.  Yes, I did.
9          MR. JOHNSON:  I have no other questions,
10 thank you very much.
11         MR. JOHNSON:  We have marked Exhibits 1
12 through 13, I don't know what you want to do with these
13 brochures, Roger.  As far as I am concerned, if you want
14 to take custody of them, that is fine, or we can put
15 them with the original deposition, whatever you want.
16 Exhibits 1 through 5 are written materials which I would
17 like to have copies of, and you can either have your
18 office do it or Mr. May can do it, but I want copies
19 attached to the deposition.  Exhibits 6, 7 and 8 are the
20 audio tapes which you already provided me and I am going
21 to take those with me.
22         MR. DAMGAARD:  That's not a problem.
23         MR. JOHNSON:  What do you want to do with
24 Exhibits 9 through 13.
25         MR. DAMGAARD:  Turn all the rest of the

Page 7

1  Exhibits over to Jerry, and he can attach the ones he
2  mentioned you wanted attach, and then attach the
3  brochures to the original transcript.
4          MR. DAMGAARD:  Janine, you can read and
5  sign the deposition today or you can waive the reading
6  and signing of the deposition today.  I would advise you
7  to say you waive that.
8          THE WITNESS:  I waive that.

Page 8

1  STATE OF SOUTH DAKOTA )
2                        :SS            CERTIFICATE
3  COUNTY OF MINNEHAHA )
4
5
6          I, JERRY MAY, Court Reporter and Notary
7  Public within and for the State of South Dakota:
8          DO HEREBY CERTIFY that the witness was
9  first duly sworn by me to testify to the truth, the
10 whole truth, and nothing but the truth relative to the
11 matter under consideration and that the forgoing pages
12 1-7, inclusive are a true and correct transcript of my
13 stenotype notes made during the time of the taking of
14 the deposition of this witness.
15         I FURTHER CERTIFY that I am not an
16 attorney for, nor related to the parties to this action,
17 and that I am in no way interested in the outcome of
18 this action.
19         In testimony whereof, I have hereto set
20 my hand and official seal this 25th day of February,
21 2000.
22
23
24  _____
25                NOTARY PUBLIC